UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**MURIEL'S NEW ORLEANS, LLC**
      **Plaintiff,**        **CIVIL ACTION**

**VERSUS**              **2:20-CV-02295-NJB-MBN**

**STATE FARM FIRE AND CASUALTY**   **SECTION: "G" (5)**
**COMPANY**
      **Defendant.**

### FIRST AMENDED COMPLAINT

**NOW INTO COURT**, comes Plaintiff, Muriel's New Orleans, LLC d/b/a Muriel's Jackson Square (hereinafter "Muriel's") through undersigned counsel, who, pursuant to leave of court granted (R. Doc. 65), respectfully amends the entirety of its state court petition to state as follows:

#### NATURE OF THE ACTION

1. This is an action by Plaintiff, Muriel's, against Defendant, State Farm, for its wrongful denial of insurance coverage for lost business income resulting from the action of a governmental body in the midst of a pandemic.

2. State Farm contracted to pay for direct physical losses resulting from "conduct, acts or decisions, [of a] governmental body" that are not excluded from coverage. The decisions and actions of various governmental bodies caused Muriel's business operations to be completely shutdown for two and half months, before allowing limited operations.

3. Muriel's lost the functionality and use of its insured physical property for its only intended purpose as a direct result of the governmental actions and civil orders restricting the use of its facility.

4. Multiple courts across the country have determined that this loss of use of the insured property is direct physical loss as required to trigger insurance coverage.

5. State Farm had the option to exclude pandemics if it had so desired. It chose not to include clear excluding language, and it cannot rewrite the policy now. *See, e.g.*, *Henderson Road Restaurant Systems, Inc., v. Zurich American Ins. Co.*, 1:20-cv-01239-DAP, (N.D. Ohio 01/19/21).

6. State Farm also defrauded Muriel's by amending the State Farm policy to exclude coverage for pandemic events like SARS, without disclosing that exclusion in the Policy. State Farm obtained permission to amend its policy without an accompanying rate reduction by testifying to the Louisiana Department of Insurance that the addition of the word "virus" was only meant to clarify the existing "contamination exclusion."

7. Once Covid-19 hit, State Farm declared that the addition of the word "virus" was actually intended to specifically preclude coverage for pandemics, without any relation to a contamination of the property. This intentional effort to hide an exclusion from Muriel's (and the broader population of insureds) constitutes fraud under Louisiana law.

8. Had Muriel's been made aware by State Farm that a pandemic event would be excluded from coverage, it could have increased its supplemental Pandemic policy to sufficiently cover its losses. Instead, it was fraudulently induced to believe it had $2 million in business interruption coverage based on the face of the policy and therefore had only minimal coverage under an unrelated Pandemic Event Endorsement policy.

**PARTIES**

9. Made Plaintiff herein is Muriel's New Orleans, LLC d/b/a Muriel's Jackson Square (hereinafter "Muriel's"), who is a Louisiana limited liability company authorized to do and doing business in the Parish of Orleans, State of Louisiana.

10. Made Defendant herein is: State Farm Fire and Casualty Company (hereinafter "State Farm") subscribing to Policy Number 98-BT-Q670-6 issued to Plaintiff for the period of June 19, 2019 to June 19, 2020.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over the matters alleged herein according to its Order of November 18, 2020 (R. Doc. 30), denying Muriel's motion to remand the matter to state court.

**FACTUAL BACKGROUND**

12. This is an action by Muriel's against State Farm for its wrongful denial of insurance coverage for lost business income resulting from the actions and decisions taken by multiple governmental bodies to reduce life threatening harm to the public during a global pandemic.

13. The covered location is the location of Muriel's Jackson Square, a well-known New Orleans restaurant in the heart of the French Quarter at 801 Conti St., New Orleans, Louisiana 70116 (hereinafter "Property").

14. Muriel's business requires that its facility be open to the public for in-person dining in order to generate sufficient revenue to be profitable and remain in business. Prior to the pandemic, takeout orders accounted for less than one percent (1%) of Muriel's business. In 20 years of business Muriel's has never operated in the retail market of food delivery. Muriel's

business focus and physical property is designed for large gatherings – *i.e.*, banquets, receptions, corporate events, *etc*.

15. Muriel's acquired an "all risk" policy that does not exclude pandemics from coverage. The Property is covered under a policy of insurance issued by State Farm with policy 98-BT-Q670-6 (hereinafter "Policy").

16. Muriel's purchased businessowner's insurance to protect against threats it could not identify sufficiently to protect itself from. In exchange for Muriel's payment of $70,458, State Farm provided the Declarations page, along with the coverage expanding endorsements. The actual insurance policy was not provided to Muriel's at the time of contract formation. The Declarations page delivered at payment included numerous additional lines of coverage added to the State Farm policy. The list of added endorsements to coverage is four pages long and covers losses up to the $2,000,000 policy limit.

17. Specifically, Muriel's purchased a Loss of Income and Extra Expense endorsement (CMP-4705.2) from State Farm. Muriel's management specifically understood that a pandemic event causing a business shutdown would be covered by the State Farm Policy, including the Loss of Income and Extra Expense endorsement (CMP-4705.2).

18. With this understanding Muriel's management team also purchased a $100,000 supplemental Pandemic Event Endorsement policy (TNR 18 8231) from Professional Liability Insurance Services, Inc. ("PLIS") as the Appointed Representative for Certain Underwriters at Lloyd's. Had State Farm informed Muriel's that it intended to exclude pandemics from its Policy, Muriel's could have increased this supplemental coverage from PLIS to better protect itself, and also demanded a lower rate on the State Farm policy.

19. The State Farm policy is an "all-risk policy," insofar as it provides that accidental direct physical loss is covered under the policy unless specifically excluded or limited in the policy. State Farm provided coverage for all "accidental direct physical loss to Covered Property unless the loss is" specifically excluded, and not added by Endorsement. *See* Businessowner's Coverage Form CMP-4100 at p. 4, Rec. Doc. 12-3.

20. State Farm chose not to define "accidental, "direct," "physical," or "loss" in the combined 101 pages of the CMP-4100 policy and Extensions of Coverage (Rec. Doc. 12-3).[1] "'Loss' and 'direct physical loss' are not defined in the policy; accordingly, those terms must be given their ordinary, generally-accepted meanings. *See* La. C.C. art. 2047." *Mangerchine v. Reaves*, 2010 1052 (La.App. 1 Cir. 03/125/11), 63 So. 3d 1049, 1056.

21. Louisiana cases make clear that "loss" does not require damage to the physical structure of the insured property. As the Louisiana First Circuit Court of Appeals explained, "[a]nother definition of 'loss,' in the specific context of insurance, is 'the amount of an insured's financial detriment by . . . damage that the insurer is liable for…The term 'loss,' on the other hand, combines the element of physical damage to the property with that of corresponding reduction in patrimony from the subjective standpoint of the insured.'" *Id*.

22. Other federal courts have also considered the use of "direct physical loss" in insurance policies and found loss of business to be covered. *See, e.g.*, Order Denying Motion to Dismiss, *Studio 417, Inc., et al., v. The Cincinnati Insurance Company*, 6:20-cv-03127-SRB, Rec. Doc. 40, 8/12/20, p. 8. As the *Studio 417 C*ourt concluded, loss includes "losing possession" and

---

[1] The Policy does define "accident" at Section I – Definitions (Rec. Doc. 12-3, at 23 or 102) but that specific term is limited to the Equipment Breakdown coverage section of the policy and the definition provided is accordingly limited to equipment.

"deprivation." *Id.*, at 8. Other examples have been detailed in Muriel's opposition (R. Doc. 27) to State Farm's motion to dismiss (R. Doc. 12).

23. Plaintiff and State Farm entered into a contract of indemnity, whereby Plaintiff agreed to make cash payments to State Farm in exchange for State Farm's promise to indemnify Plaintiff for losses including, but not limited to, business income losses.

24. The Policy was in full effect, providing property, business personal property, business income, and extra expense, and additional coverages between the period of June 19, 2019 through June 19, 2020.

25. Plaintiff faithfully paid policy premiums to State Farm, specifically for coverage under the Business Income and Extra Expense Coverage Form in the event of business closures by order of Civil Authority.

26. Under the Policy's Civil Authority provision, insurance coverage is extended to apply to the actual loss of business income sustained and necessary extra expenses incurred when access to the insured premises is specifically prohibited by governmental decision, action or order as a direct result of a covered cause of loss to the covered property or any property not more than one mile of Plaintiff's covered location.

27. Separate and apart from the Civil Authority provision is the Acts or Decisions "contra-exclusion." Muriel's paid increased premiums to add protections against the loss of income caused by decisions of a governmental body that resulted in loss of use of the restaurant. Coverage for the executive order that rendered the insured property uninhabitable and unavailable is expressly included at Section I(3)(b).

28. This section is an exclusion section, but then adds a "but, if" clause that provides coverage if that condition is met. Therein the policy states that State Farm will pay for direct

physical losses resulting from "conduct, acts or decisions, [of] governmental body" that are not excluded from coverage. The policy expressly states:

> **b. Acts or Decisions**
> Conduct, acts or decisions, including the failure to act or decide, of any person, group, organization or **governmental body** whether intentional, wrongful, negligent or without fault.
> …
> *But if accidental direct physical loss results from* items 3.a., ***3.b.* [acts or decisions of government],** or 3.c., *we will pay for that resulting loss* unless the resulting loss is itself one of the losses not insured in SECTION I of this coverage form.[2]

29. In response to the Centers for Disease Control (CDC) and World Health Organization (WHO)'s instructions regarding the pandemic, Governor John Bel Edwards in his official capacity as Governor of Louisiana, issued a statewide Civil Authority Order, Proclamation Number JBE 2020-27 (hereinafter "the Order"), on March 13, 2020, banning gatherings of 250 or more people in a single space at the same time where individuals will be in close proximity to each other.

30. On March 16, 2020, the Governor supplemented that order limiting gatherings to no more than 50 people and ceased all restaurants, cafes, and coffee shops, statewide, from allowing any on premises consumption of food or beverages.

31. In addition, the office of the Mayor of the City of New Orleans issued an Emergency Proclamation, which required all establishments, including restaurants, to close until April 16, 2020, effective March 17, 2020, allowing only take-out or delivery service. Mayor Cantrell cited that "Covid-19 may be spread amongst the population by various means of exposure,

---

[2] Business Owner's Coverage Form CMP-4100 at R. Doc. 12-3, Section I(3)(b) (*emphasis in bold italics added*)

including the propensity to spread person to person…" *See* Mayor Latoya Cantrell's March 16th, 2020 Emergency Proclamation attached.

32. Mayor Cantrell further extended those orders on April 15, 2020, and also issued a mandatory Stay-at-Home order pursuant to and in compliance with Proclamation Number 41 JBE 2020 issued by Governor John Bel Edwards, dated April 2, 2020, requiring all residents to stay at home unless the travel is deemed essential and necessary, effective April 16, 2020 through May 16, 2020. *See* Mayor Latoya Cantrell's April 15, 2020 Emergency Proclamation.

33. As a further direct and proximate result of the Proclamations issued by the City of New Orleans and the State of Louisiana, Muriel's closed its doors on March 16, 2020 and furloughed a significant number of employees due to the prohibition of access to the insured premises. Muriel's never found any evidence of the Covid-19 virus on its property.

34. As of June 13, 2020 Muriel's was allowed to host dining guests at 50% capacity (Phase Two Reopening Plan), but it still could not host any banquet guests. Muriel's losses from this restriction exceed the coverage limits of the Policy.

35. The shutdown orders issued by the City of New Orleans and State of Louisiana, and their effects on Plaintiff's business, property, and operations constitute a direct physical loss to covered property and is a covered loss under the terms of the policy.

36. Like nearly all the restaurants in the French Quarter, Muriel's lost the functionality and use of its physical property as a direct result of the governmental decisions and actions, in the form of a civil order restricting the use of its facility for its sole function of serving food to public gatherings.

37. Muriel's business is not designed for a delivery or take-out business plan. Muriel's physical property is specifically designed for large gatherings and on-property dining.

38. The Emergency Order of New Orleans Mayor Cantrell is clearly an action or decision by a governmental authority that results in direct physical loss by preventing Muriel's from conducting business from his Property.

39. This loss of use is a direct physical loss under the Policy.

40. Muriel's submitted its proof of loss to State Farm as required by the Policy.

41. State Farm denied coverage claiming that Muriel's: (i) had not suffered physical loss or damage, and (ii) was precluded from covered due to the "virus" exclusion. Muriel's sustained tremendous financial damages due to the loss of use and functionality of the Covered Property.

42. State Farm's reliance on the virus exclusion is misplaced. Muriel's has not claimed damage from a virus on the property. State Farm chose not to include a pandemic or communicable disease exclusion. Instead, it claims that adding "virus" to the list of contaminants it would not insure was intended to exclude pandemics.

43. The plain words of the Policy show that Start Farm cast its virus exclusion as a contamination exclusion, restricting coverage for remediation, removal, detoxifications, and rebuilding as a result of said contaminants. The contamination exclusion at issue states as follows:

> 1. We do not insure under any coverage for any loss **which would not have occurred in the absence** of one or more of the following excluded events…
>
>> J. (1) Growth, proliferation, spread or presence of "fungi" or wet or dry rot; or
>>
>> (2) ***Virus***, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease; and
>>
>> (3) We will also not pay for:

> (a) Any loss of use or delay in **rebuilding, repairing or replacing** covered property, including any associated cost or expense…
>
> (b) Any **remediation** of "fungi", wet or dry rot, virus, bacteria or other microorganism…
>
> > i. **Remove** the fungi…
> > ii. Tear out or **replace**…
> > iii. Contain, treat, **detoxify**…
>
> (c) The cost of any **testing**…[3]

44. This is clearly intended for the reader of the policy to understand that contamination/pollution would not be covered by the Policy. It does not unambiguously state that the decision or actions of a governmental body (Section I(3)(b))[4] would be excluded if that action was related to a virus outside the Property that required the shutdown of all restaurants.

45. Ambiguities in insurance policies must be interpreted against the insurer as the drafting party. Further, exclusions from policy coverage must be specific and clear in order to be enforceable, and they are not to be extended by interpretation or implication but are to be accorded strictly and narrowly.

46. State Farm was acutely aware of the threat a pandemic could cause to its insureds as a result of the SARS pandemic of 2003. State Farm admits in this proceeding that the "virus" language was intended by State Farm to exclude more than contamination events. If the virus exclusion is broader than contamination of the insured property, then State Farm was obligated to reduce its policy premium to reflect the reduced coverage caused by a pandemic exclusion.

---

[3] Business Owner's Coverage Form CMP-4100 at R. Doc. 12-3, Section I (1)(J).
[4] Business Owner's Coverage Form CMP-4100 at R. Doc. 12-3, p. 56 of 102.

47.     The reduction of the policy premium to reflect a reduction in coverage would have been applied to all policies in Louisiana and therefore caused a significant reduction in revenue to State Farm for the unknown number of years until a pandemic event occurred.

48.     In order to avoid the revenue losses required by the reduction in coverage, State Farm intentionally misled the Louisiana Department of Insurance. State Farm declared the "virus" language added to the policy only clarified the existing **contamination** exclusion. As State Farm's representative explained, "[i]n light of these concerns, we are presenting an exclusion **relating to contamination** by disease-causing viruses or bacteria or other disease-causing microorganisms."[5] That is why the Louisiana Department of Insurance (LDI) specifically asked if there was a premium reduction tied to this proposed policy amendment:

> **[LDI] Question**: Please identify if there's a **premium decrease associated with this exclusive endorsement, which is a reduction to existing coverage**?
>
> **Answer**: The introduction of **this exclusion endorsement would not be a reduction in coverage**. As the explanatory memorandum state, the **current pollution exclusion in property policies encompasses contamination** (in face, uses the term contaminant in addition to other terminology). Loss or damage caused by viral or bacterial contaminants are not intended to be covered under current property policies. Therefore, there would not be any rate impact as a result of the filing of this form, as it does not exclude any type of coverage that is currently provided under the policy. This endorsement is being introduced for the purpose of elaborating on a high-profile exposure, and thus to reinforce existing exclusions to prevent unfounded claims for coverage, that does not exist in the current policy.[6]

---

[5] Exhibit 1 hereto, at LDI000898-9.
[6] Exhibit 1 hereto, at LDI000937.

11

49. There is no claim that Muriel's was contaminated by the Covid-19 virus. The word virus was only to be applied to the contaminant exclusion of the State Farm policy.

50. Pandemic Event and Communicable Disease exclusions are the standard language of the insurance industry when describing pandemic events and viral infections not tied to property contamination. State Farm actively chose not to use this language, or similar language, to inform its contract counterparties that it intended to exclude damages resulting from pandemic shutdowns, despite its very specific and (now admitted) desire to remove exactly that event from coverage.

51. State Farm defrauded Muriel's by intentionally drafting the Policy to contain an exclusion it knew was not indicated in the words of the Policy. Its successful effort to deceive the Louisiana Department of Insurance is further proof of its fraud against Muriel's and all other insureds subject to the same provision.

52. This allegation is given more weight by the Judgement of Judge Polster in the matter of *Henderson Road Restaurant Systems, Inc., v. Zurich American Ins. Co.*, 1:20-cv-01239-DAP, (N.D. Ohio 01/19/21). In granting summary judgment finding coverage for pandemic losses, Judge Polster notes evidence of the same plan being executed in Ohio, where Zurich claimed its "virus" addition to its policy was also part of its existing "contamination" exclusion.

53. Muriel's alleges herein exactly what Judge Polster noted, the insurer cannot call the virus language a contamination clarification and then claim it was always intended to be a limit on damages incurred by actions or decisions of governmental entities during a pandemic unrelated to any contamination event:

> Zurich argues that Ohio law has not recognized the doctrine of regulatory estoppel. ECF Doc. 16 at 12. That may be. But, at the least, the 2006 representations to the Ohio Department of Insurers show the insurers' intent in adding the Microorganisms exclusion to their policies. **They were attempting to exclude coverage for property damage caused by the contamination of viruses and bacteria on the insureds' premises, not the loss of business income caused by a government closure. And here, the Plaintiffs' properties were not damaged by the contamination of a virus or bacteria**.[7]

54.     Just as is true for the State Farm here, Judge Polster noted that, "[g]oing forward, Zurich could undoubtedly include an exclusion for government closures in its policies. But the Policy that Plaintiffs purchased did not contain such an exclusion." *Henderson Road Restaurant Systems, Inc., v. Zurich American Ins. Co.*, 1:20-cv-01239-DAP, (N.D. Ohio 01/19/21), *33.

55.     In standard insurance industry fashion, those detailed terms to describe a pandemic include the following boiler-plate language to clearly describe a pandemic event. As set forth in the PLIS Form PE 02-17 of the supplemental policy purchased by Muriel's, "Pandemic Events" are either:

> (a) the actual presence of an Infected Person within a Covered Location; or,
>
> (b) **the announcement by a Public Health Authority that a specific Covered Location is being closed as a result of an Epidemic declared by the CDC or WHO**.

56.     The term "Epidemic" is defined in PLIS, Inc.'s Form PE 02-17 as follows:

> "Epidemic" means an occurrence of a **<u>Covered Disease</u>** that:
>
> (a) rapidly and unexpectedly becomes widely distributed and affects or attacks persons simultaneously throughout a geographic location, region, territory, cow1try, continent, or globally as defined by the World Health Organization ("WHO"), or the Center for Disease Control ("CDC"); and

---

[7] *Henderson Road Restaurant Systems, Inc., v. Zurich American Ins. Co.*, 1:20-cv-01239-DAP, (N.D. Ohio 01/19/21), *33. (emphasis added)

(b) would impair normal physical function of any part, organ or system (or a combination thereof) of the body that manifests by a characteristic set of signs and symptoms.

57. The "Covered Disease" used to define Epidemic is defined as follows, and specifically covers Coronavirus and its mutations and variations:

"Covered Disease" is limited to the following pathogens, **their mutations, or variations**:

Avian Flu, Measles, Severe Acute Respiratory Syndrome-associated **Coronavirus (SARS-CoV) disease**, Bubonic Plague , Meningococcal, Diphtheria, Monkpox, Smallpox, Ebola, Mumps, Swine Flu, Hand, Foot and Mouth Disease, Pertussis, Tuberculosis (TB), Human Papillomavirus (HPV,) Polio, Varicella (Chickenpox), Legionellosis, Rabies, Yellow Fever, Leprosy, Rotavirus, Zika Virus, Malaria Rubella or, as designated by Underwriters

58. This is the standard language of the insurance industry when describing a pandemic event in a manner meant to disclose its meaning.

59. These terms are clear and unambiguous and inform the insured of the scope of its coverage. None of this boiler-plate pandemic language is included in Muriel's policy to clearly exclude it from coverage. Adding the word "virus" to an existing fungi and bacteria contamination exclusion does not in any way disclose a pandemic exclusion.

60. Had State Farm desired to exclude coverage for interruption of Muriel's business due to governmental decisions to shut down its operations in the wake of a pandemic, it would have indicated that in clear terms Muriel's could reasonably understand.

61. Just as the exclusion for Nuclear War and the exclusion for Terrorist Events makes obvious and clear, the insurance industry, and Start Farm in particular, know how to expressly exclude a known risk from coverage when they want to.

62. State Farm chose *not* to exclude pandemics using the standard industry definitions in order to keep its premium price inflated, and Muriel's was right to understand it had coverage for this anticipatable threat to operations.

63. State Farm defrauded Muriel's and should be held to provide specific performance of the contact as written and explained to the Louisiana Department of Insurance.

64. State Farm should be equitably estopped from obtaining a policy "clarification" amendment regarding contamination events at the property and then applying that small change as if a Pandemic Event or Communicable Disease Exclusion had been approved and amended to the policy.

65. State Farm's conduct meets the requirements for equitable estoppel. First, it intentionally misrepresented its policy coverage to the Louisiana Department of Insurance and Muriel's. Second, Muriel's relied on the misrepresentation when entering the insurance contact. And finally, Muriel's financial position has been harmed by over $2 million as a result of the misrepresentation. *See*, *MB Indus., LLC v. CNA Ins. Co.*, 74 So. 3d 1173, 1180, (La. 10/25/2011), 2011 La. LEXIS 2594, *15-16, 2011-0303 (La. 10/25/11).

### Claim I

#### BREACH OF CONTRACT

66. Plaintiff refers to each and every paragraph of the Petition and incorporates those paragraphs as though set forth in full in this cause of action.

67. Plaintiff made a proper and timely claim for benefits due under the policy.

68. State Farm wrongfully denied the claim and has refused to pay any benefits under the policy for the covered losses.

69. Plaintiff complied with all the conditions precedent to receive the benefits under the terms and conditions of the policy from State Farm. However, State Farm has failed to pay Plaintiff's claim for benefits.

70. State Farm had a duty and obligation under the policy, the law, and insurance industry customs and practices to, among other things, pay Plaintiff's property, business income and payroll losses, as more fully discussed above. State Farm was likewise obligated to conduct a thorough investigation of all bases that might support Plaintiff's claim for coverage.

71. As a direct and proximate result of State Farm's breach of contract, or in the alternative, anticipatory breach of contract, Plaintiff has suffered, and continues to suffer significant damages.

## Claim II

### FRAUD

72. Plaintiff refers to each and every paragraph of the Petition and incorporates those paragraphs as though set forth in full in this cause of action.

73. Fraud is defined by La. C.C. Art. 1953 as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction."

74. State Farm admits that it anticipated a SARS-like pandemic event in Louisiana and sought to limit its risk in any way related to a pandemic.

75. State Farm did not want to reduce its policy premium as a result of this reduced policy exposure and therefore told the Louisiana Department of Insurance it wanted to have the word "virus" added as part of its contamination exclusion without an express pandemic exclusion.

76. Once the expected pandemic hit, State Farm declared it had excluded pandemics through the addition of the word "virus" as an additional contaminant. State Farm now asserts that the term "virus" is not limited to contamination events on the covered property, as asserted to the Louisiana Department of Insurance in order to obtain the policy change but excludes any event in any way related to a virus regardless of whether or not the Property is contaminated.

77. This was a misrepresentation with the intent to obtain an unjust advantage and constitutes fraud in Louisiana. State Farm's fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. *See* La. C.C. Art. 1957.

78. Pursuant to La. C.C. Art. 1958, State Farm is liable to Muriel's for the damages caused as well as attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Muriel's New Orleans, LLC d/b/a Muriel's Jackson Square, prays that after due proceedings are had, there be a judgment rendered in its favor and against Defendant, State Farm, awarding the policy limits of the State Farm policy and finding that State Farm defrauded Muriel's by intentionally concealing its intent to exclude losses related in any way to a pandemic event, separate and apart from contamination events as stated in the Policy. Plaintiff further moves for the award of attorney's fees and legal costs pursuant to La. C.C. art. 1958.

[*signature block on the following page*]

**Respectfully submitted**, this 10th day of May 2021.

*DAVILLIER LAW GROUP, LLC*

/s/ Charles F. Zimmer II
Daniel E. Davillier, La. No. 23022
Charles F. Zimmer II, La. No. 26759
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA 70112
Telephone: (504) 582-6998
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com
jlewis@davillierlawgroup.com

*Counsel for Muriel's New Orleans, LLC*

### Certificate of Service

I certify that I have served a copy of the above and foregoing pleading via Notice of Electronic filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system on this 10th day of May 2021.

/s/ Charles F. Zimmer II
Charles F. Zimmer II